UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| PAUL E. DOWNING, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 20-187-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| JOSH PETRY, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Defendants Brian Eaves and Josh Petry's motions for summary judgment and to exclude the testimony of Roger A. Clark, Plaintiff Paul Downing's proposed expert witness.  [Record Nos. 54, 57]  The motion for summary judgment will be granted because the plaintiff's claims against Eaves are untimely, Petry is entitled to qualified immunity, and Downing has otherwise failed to raise any genuine issues of material fact regarding his claims against Petry.  The defendants' motion to exclude Clark's testimony will be granted because his opinions are not relevant to the facts at issue in this case.

## I.      BACKGROUND

On May 7, 2019, officers from the Madison County Sheriff's Office ("MCSO") responded to a residence at 101 Masters Court in Richmond, Kentucky, where Plaintiff Paul Downing ("Downing") lived with his mother Shirley.  Patty May, a nurse with Wellcare, had just called 9-1-1 reporting that Downing had a gun and was going to shoot himself.  May advised the 9-1-1 operator that Downing had "just reloaded" and that he had "done this before."  May, who was speaking with Downing on another line, asked him if he had been drinking.

- 1 -

However, she did not receive an audible response and her call with Downing disconnected. The 9-1-1 operator advised May that officers were on their way to Downing's residence.

An audio recording of radio traffic indicates that at least two of the responding officers were familiar with Downing and that MCSO had been called recently when Downing shot himself in the foot.  [Record No. 54-6]  MCSO Deputies Todd Chitwood, Josh Petry, Brian Eaves, and David Thurman arrived at the residence between 3:48 and 3:49 p.m.  Upon their arrival, they observed Shirley mowing the lawn.  Officers told Shirley why there were there and asked her where Downing was located.  Shirley advised that she was unsure.  [Record No. 54-8, p. 8]  Sergeant Petry instructed her to get off of the mower and "go across the street and stay out of the way."  [Record No. 54-10, p. 6]

As the senior officer on the scene, Petry was responsible for positioning and handling the scene and officer safety.  *Id.*  He and Chitwood walked around the left side of the house toward the rear, while Deputies Eaves and Thurman covered the front of the home.  Petry explained that, since the officers did not know where Downing was located, they were "covering the whole perimeter of the residence."  *Id.* p. 7.

Petry and Chitwood observed two closed garage doors on the left side of the residence, as well as a pickup truck backed in front of the right garage door.  The two officers proceeded through a gate connected to a chain link fence when they observed an entry door into the garage that was partially opened.  *Id.* p. 8.  Petry or Chitwood pushed the door open and Petry repeatedly announced the officers' presence and directed Downing to come out.  *Id.* [Record No. 54-8, pp. 8-9] As this was happening, the officers heard a noise coming from the screened-in deck that was just around the corner at the rear of the residence.  According to the officers'

testimony, Downing had emerged from the back of the house and was standing on the deck with a blank stare, holding a rifle.[1]

Petry recalled that Downing was initially holding the rifle at waist-level. He explained, "if you [were] walking straight out of the house, he would've been pointing it straight ahead of him and then when I said 'drop the gun' to him, he started to turn toward our location." [Record No. 54-10, p. 8] Chitwood recalled that when the officers turned and looked at Downing, he raised the rifle at them. [Record No. 54-8, p. 9]

At that point, Petry called out "long gun," and he and Chitwood retreated back around the house and took cover beside the truck parked in front of the garage. *Id.* pp. 9, 11. Petry first went to the passenger side of the truck but could not "get a full visual of the garage doors," so he and Chitwood moved around to the driver's side. He then moved to grassy area beside the driver's side of the truck so that he could "get a clear picture of the garage doors and the rear corner of the house." *Id.* p. 12. The left garage door started coming up and Petry yelled out "contact, contact" to let everyone know there was movement. *Id*. at p. 14.

Once the door was raised, Petry could see Downing standing just inside the garage, holding the long rifle in a "low ready position," or "kind of behind his right hip with the barrel extended." *Id.* at pp. 12, 15. Petry claims that he gave several commands for Downing to drop the weapon at which point Downing raised the rifle in Petry's direction. *Id.* at p. 14. Petry reports that he hit the ground on his stomach and "heard a shot go off." Petry jumped back to his feet and saw Downing still pointing the rifle in his direction. Petry reports that he fired at Downing at that time. *Id.*

---

[1]    A call for service noted "1 male on porch w/ a long gun" at 15:50:09." [Record No. 54-7, p. 2]

Deputy Eaves and Thurman's deposition testimony is consistent with this version of events.  They reported that, while they were standing in front of the house, Petry and Chitwood hurriedly came back through the gate and Petry advised that Downing had a long gun.  [Record No. 54-9, p. 6]  Eaves holstered his pistol and ran to his cruiser to retrieve his patrol rifle.  He came back toward the front left corner of the house "to watch and see if [Downing] was actually going to come around the back side of the house the way that Sergeant Petry and Deputy Chitwood did as well."  Shortly thereafter, the garage door started to raise and Eaves could see "the barrel of a large gauge-weapon, which appeared to be a shotgun."  *Id.* at p. 7.  While Thurman was still standing at the back of his Tahoe, he saw the garage door going up and Downing "standing in the doorway and what appeared to be a long-gun in his hands." [Record No. 54-18, p. 9]

Thurman testified that, while this was happening, Petry and Chitwood were continually yelling for Downing to put the gun down at which time Downing "made a motion to raise it." *Id.* p. 10.  Eaves testified that he heard Petry yell either "drop it, Paul" or "put it down, Paul," to which Downing responded, "shoot me mother f---s."  [Record No. 54-9, p. 8]  According to Eaves, he took a step to the side and could see that Downing was pointing his weapon in Petry and Chitwood's direction.  Eaves fired at Downing, aiming at his forearm, which was the only part of his body he could see.  *Id.* at p. 8.[2]  According to Petry and Eaves, Downing, still holding the rifle, said "shoot me again, mother f---s."  Petry then fired several shots and Downing fell.

---

[2]      A call for service noted "shots fired at 15:50:55."  [Record No. 54-7, p. 2]

Kentucky State Police Sergeant Gabe Welch interviewed Shirley Downing on May 7, 2019.  [Record No. 54-19]  Shirley advised Welch that she was mowing the yard when she saw blue lights approaching earlier that day.  *Id.* p. 15.  She observed uniformed officers emerge from the sheriff's cruisers, and she easily recognized them as police officers.  She heard yelling, which included the officers telling Downing to "get out of there" and "to drop the gun." *Id.* at p. 19.  She also heard Downing holler "shoot again." *Id.* p. 18.  Shirley advised Welch that Downing was an alcoholic who was "always drinking."  She knew he had been drinking that day because she had taken him to the liquor store to get beer.  *Id.* p. 25.  During her deposition taken on May 26, 2021, Shirley did not recall making these statements.  However, she testified that she "tr[ies] very honestly to tell the truth," and she had been telling the truth to KSP officers on May 7, 2019.  [Record No. 54-20, pp. 2-3]

Downing's version of events differs somewhat.[3]  He testified that, on May 7, 2019, he returned a call to a nurse from his insurance company.  [Record No. 54-12, p. 2]  After that, he was working on an old, inoperable rifle in the basement of his residence.  Downing acknowledged that he had walked onto his deck while holding the rifle before going into the garage, but maintains he did not see or hear any police officers.  *Id.* at p. 7.  He reported that he opened the garage door so that he could go out and get some wood blocks that were laying

---

[3]     Although the Court does not consider them for purposes of the defendant's motion for summary judgment, it is notable that Downing's unsworn statements to KSP Detective Luke Vanhoose on the evening of May 7, 2019, differ dramatically from those given during his deposition.  [Record No. 54-14]  For instance, Downing reportedly told Vanhoose that he grabbed his rifle after hearing sirens.  Even though he knew the rifle would not fire, he pointed it at officers "[be]cause he was pissed off and . . . so distraught through all this different stuff [he'd] been going through." *Id.* p. 7.  According to Vanhoose's report, Downing also stated that, "maybe it was a way of suicide by cop." *Id.*  Downing denied having made the statements, asserting that the audio recording of the interview was fabricated.  [Record No. 66-2, p. 5]

near the truck.  He walked outside the garage door about three or four feet, holding the rifle pointed downward in his left hand.  At that point, he realized that his mother was not mowing the lawn and he looked around to see where she was located.

According to Downing, a police officer suddenly popped his head up over the driver's side of the truck and pointed a rifle at him.  *Id.* at pp. 3-4.  Another officer appeared in front of the truck and the first officer disappeared.  Then, the second officer disappeared and a third officer was "standing there right out in the open between the bumper of [the] truck and the garage door."  Downing testified that as soon as he looked at the officer, he "got hit in the arm" and fell back inside the basement floor.

Downing was transported to the University of Kentucky Medical Center Emergency Department where he was treated for gunshot injuries to his arm.  He was initially charged with a single count of attempted murder.  However, on July 11, 2019, was indicted for the lesser charges of two counts of first-degree wanton endangerment based on the events of May 7, 2019.  Those charges remain pending in Madison Circuit Court.  *See Commonwealth v. Downing*, Case No. 19-CR-603.

Downing filed a Complaint in this Court on May 5, 2020, asserting a host of claims against Petry, Chitwood, the Madison County Sheriff's Office, and various unnamed law enforcement defendants.  Specifically, he alleged that Petry and Chitwood used excessive force against him in violation of the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.  He asserted claims against Petry and Chitwood for state-law assault and battery and intentional/negligent infliction of emotional distress.  He also alleged that the Madison County Sheriff's Office violated his constitutional rights through its policies and customs and its failure to train and supervise its employees regarding the use of deadly force.

Downing filed an Amended Complaint on December 16, 2020.  Therein, he removed Deputy Chitwood as a defendant and added Deputy Eaves.[4]  Eaves filed a motion to dismiss the claims against him, arguing they were barred by the applicable statute of limitations because the Amended Complaint did not relate back to the date of the filing of the original Complaint.  The Court determined that this question could not be resolved without resort to matters outside the pleadings and denied the motion to dismiss without prejudice.

Defendants Eaves and Petry have now filed a motion for summary judgment, which renews the argument that the Amended Complaint does not relate back to the original with respect to Downing's claims against Eaves.  Eaves and Petry contend that they are otherwise entitled to summary judgment on each of Downing's claims.  The defendants also have filed a motion to exclude the opinions and testimony of Downing's expert, Roger Clark.

## II.  MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF ROGER CLARK

The plaintiff has retained Roger A. Clark to provide expert testimony regarding proper police practices in dealing with mentally ill and/or suicidal individuals.  The defendants contend that Rogers' testimony should be excluded because it is irrelevant to any fact at issue in this case.

### A.   Standard of Review

Admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

---

[4]     Downing also amended his Complaint to remove the Madison County Sheriff's Office as a defendant and add the "Commonwealth of Kentucky doing business as Madison County Sheriff's Office."  There is no indication in the record that the Commonwealth of Kentucky was served with the Amended Complaint.  Additionally, the defendants contend that the Madison County Sheriff's Office is an agency of Madison County, "not a d/b/a of the Commonwealth."   [Record No. 54-1, p. 22]

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts and data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The relevancy prong of Rule 702 requires that an expert's testimony adequately "fit" the facts of the case. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 591 (1993). As "gatekeepers," district courts are charged with "discretion in determining whether . . . a proposed expert's testimony is admissible, based on whether it is both relevant and reliable." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

## B.    Discussion

The defendants argue that Rogers' opinions regarding how police should deal with mentally ill persons is not relevant because the Sixth Circuit applies a segmental approach in assessing whether the use of deadly force is objectively reasonable. The defendants correctly observe that the Sixth Circuit applies a segmented analysis in which the court first identifies the seizure at issue and then examines "whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007)).[5] Accordingly, Rogers' opinions about the events preceding the shooting, specifically

---

[5]     Downing repeatedly asks the Court to apply a totality-of-the-circumstances approach that focuses on whether police created circumstances that led to the need for deadly force. But binding precedent requires the Court to focus on the moments immediately preceding the use of force and not the officers' tactics that led up to the need for force. *See Rucinski v. Cnty. of Oakland*, 655 F. App'x 338, 342-43 (6th Cir. 2016) (citing *Livermore*, 476 F.3d at 406).

that the MCSO deputies failed to de-escalate the situation due to Downing's mental state, are not relevant to whether the use of force was reasonable.

Downing also has asserted a claim against Petry in his official capacity that the MCSO failed to train its employees to respond to calls involving mentally ill and/or suicidal individuals. While Rogers contends that the officers' conduct fell below the accepted standard of practice, he makes no particular claim that the officers were inadequately trained. Accordingly, the plaintiff has not identified any admissible purpose for Rogers' opinions and the defendants' motion to exclude will be granted.

## III.     THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.     Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party has the initial burden to show that there is no genuine issue of material fact, but once the moving party has met its burden, the nonmoving party must demonstrate that there is sufficient evidence from which the jury could render a verdict in its favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in a

light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Additionally, an initially unsworn statement may be considered at the summary judgment stage if it is later affirmed under oath. *Moreno v. Ross Island Sand & Gravel Co.*, 2015 5604443, at *5 (E.D. Cal. Sept. 23, 2015) (citing *DG & G, Inc. v. FlexSol Pack. Corp. of Pompano Beach*, 576 F.3d 820, 825-26 (8th Cir. 2009)). *See also Kidder, Peabody & Co., Inc. v. IAG Intern. Acceptance Grp N.V.*, 28 F. Supp. 2d 126, 133 (S.D.N.Y. 1998) (exercising discretion to permit filing of affidavits to authenticate previously unsworn materials in connection with summary judgment motion).

## B.    Relation Back

Claims asserted under § 1983 and for assault and battery have a one-year statute of limitations, which accrues at the time of the alleged arrest or use of excessive force. *See Collard v. Ky. Bd. of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990); *Everett v. Presley*, 2014 WL 2878361, at *2 (W.D. Ky. June 24, 2014) (quoting *Fox v. DeSoto*, 489 F.3d 227, 233 (6th Cir. 2007)). Downing's Amended Complaint naming Defendant Eaves was not filed until December 16, 2020. This makes the claims against Eaves untimely unless the Amended Complaint relates back to the date of the original Complaint which was filed May 5, 2020.

As the Court explained previously, three requirements must be satisfied for relation-back to occur: "(1) the claims arose out of the same conduct, transaction, or occurrence set forth in the original pleading; (2) the [d]efendants to be added received such notice of the claim within [90] days of the filing of the original complaint that they would not be prejudiced in defending the suit; and (3) within [90] days of the filing of the original pleading, the added [d]efendants knew or should have known that the action would have been brought against them but for [p]laintiff's mistake concerning the identity of the proper party." *Bradford v. Bracken*

*Cnty.*, 767 F. Supp. 2d 740, 748 (E.D. Ky. 2011) (citing *Black-Hosang v. Ohio Dep't of Pub. Safety*, 96 F. App'x 372, 374-75 (6th Cir. 2004)); Fed. R. Civ. P. 15(c).  The plaintiff bears the burden of proving that the Amended Complaint relates back to the original Complaint.  *Keene v. Justice*, 2008 WL 11343418, at *3 (E.D. Ky. Nov. 21, 2018) (citing *Color Title Inc Off. Comm. of Unsecured Creditors v. Reliance Ins. Co.*, 92 F. App'x 846, 850 (3d Cir. 2004)).

The parties agree that the first element is satisfied.  However, Eaves disputes that he received notice of the claim within 90 days of the filing of the Complaint and that he knew or should have known the action would have been brought against him within that same time period.  Relying on *Berndt v. State of Tennessee and Lakeshore Mental Health Institute*, 796 F.2d 879 (6th Cir. 1986), Downing contends that Eaves received constructive notice sufficient to meet these requirements.  Specifically, Downing argues that Eaves knew or should have known about the suit and knew that he should have been named as a defendant based on his involvement in the events, his close association with Petry and the MCSO, and the fact that he is represented by the same attorney as the other defendants.

It is well-established that notice may be imputed to a new defendant for purposes of relation back.  *See Berndt*, 796 F.2d at 884.  This is especially true when the complaint alleges that the new defendant committed the illegal acts and is an official of the original defendant.  *See id.*  In that case, the relationship *may* imply sufficient notice.  However, Eaves has tendered an affidavit stating that he retired from his position at the MCSO effective December 1, 2019.  [Record No. 54-25]  Counsel for the defendants, Barry Stilz, also has tendered an affidavit, stating that his firm was retained to represent Eaves *after* Downing filed a motion for leave to amend his Complaint on December 15, 2020, and that neither he nor any other attorney at his

firm had any communication with Eaves related to the case until after the date of Downing's motion to amend.  [Record No. 54-26]

Contrary to Downing's suggestion, he has not identified any additional facts in the record to suggest that Eaves had knowledge of the lawsuit within 90 days of the filing of the Complaint (i.e., on or before August 3, 2020).  Downing filed selected pages from Eaves' deposition in which he was asked if he had talked to other people about the lawsuit.  Eaves responded "yeah, I've spoke to, you know, several people about this."  [Record No. 64-11, p. 13]  When asked who he had spoken with, Eaves said "several at the sheriff's department . . . I know Deputy Chitwood, Sergeant Petry."  Eaves then confirmed that he and Petry had known one another "quite some time" and that he kept Petry's phone number stored in his phone.  The plaintiff contends that Eaves "provided no time frame as to when he had those discussions." [Record No. 61, p. 32]  However, deponents only are expected to answer the questions they are asked.  There is no indication that Downing's counsel inquired about the timeframe in which Eaves spoke to individuals from the sheriff's office or, more to the point, whether he knew about the lawsuit within 90 days of its filing.  While the Court draws reasonable inferences in light of the non-moving party, it does not create facts out of thin air.

Downing has not satisfied his burden of demonstrating that Eaves knew or should have known about the lawsuit within 90 days of its filing.  There is no suggestion that actual notice existed, as no witness has testified that they discussed the suit with Eaves during the relevant time period.  Additionally, because Eaves retired from the MCSO six months prior to the filing of the original lawsuit, there is no basis for imputing notice to him based on his association with the other defendants.  *See McKoy v. Carter*, 2010 WL 11470887, at *6 n.6 (D. N.J. Apr. 16, 2010) (rationale that close professional connection permits imputing notice did not apply

- 12 -

when defendant had retired from police department).  Accordingly, the Amended Complaint does not relate back to the original and the claims against Eaves are time barred.

## C.      Qualified Immunity

Qualified immunity protects government officials from personal liability under 42 U.S.C. § 1983 unless they violated a federal statutory or constitutional right and the unlawfulness of their conduct was clearly established at the time.  *Reich v. City of Elizabethtown, Ky.*, 945 F.3d 968, 977-78 (6th Cir. 2019) (citing *District of Columbia v. Wesby*, -- U.S. --, 138 S. Ct. 577, 589 (2018)).  This doctrine gives "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law."  *Id.* (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)).  The issue of qualified immunity is a question of law for the Court to resolve.  *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (citing *Elder v. Holloway*, 510 U.S. 510, 516 (1994)).

Although the defendant must initially raise the defense of qualified immunity, the ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.  *Id.*  The plaintiff must show that the individual officer, through his own individual actions, personally violated the plaintiff's rights under clearly established law.  However, the defendant must show that the challenged act was objectively reasonable in light of existing law.  *Id.* (citing *Tucker v. City of Richmond*, 388 F.3d 216, 219 (6th Cir. 2004)).

It is clearly established that an individual has a right not to be shot unless he is perceived to pose a threat to pursuing officers or others.  *Russo v. City of Cincinnati*, 953 F.2d 1036, 1045 (6th Cir. 1992).   In determining whether Sergeant Petry violated Downing's constitutional right to be free from excessive force, the Court applies an objective reasonableness standard.  *Reich*, 945 F.3d at 978 (citing *Graham v. Connor*, 490 U.S. 386, 392

- 13 -

(1989)).  An officer's use of deadly force is reasonable when "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).  This test requires the Court to assess the use of force from the perspective of a reasonable officer on the scene "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation" and without the benefit of "20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396).

In performing its analysis, the Court looks at the totality of the circumstances "as they existed at the time of the alleged excessive force, without respect to how they might have been exacerbated by prior officer conduct." *Mills v. Owsley Cnty., Ky.*, 483 F. Supp. 3d 435, 460 (E.D. Ky. 2020).  While there is a "built-in measure of deference to [an] officer's on-the-spot judgment," the fact that a situation unfolds quickly, by itself, does not permit officers to use deadly force. *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020).  The relevant inquiry is whether a reasonable officer in Petry's position would fear for his life or those of his fellow officers, not what was in Downing's mind when he stood near his garage door holding a rifle. *See id.* at 436.

Downing maintains that he never pointed his weapon at police, while Eaves, Thurman, Chitwood, and Petry each testified that Downing pointed the rifle in the officers' direction when he was standing in the garage.[6]  The mere fact that the suspect possessed a weapon does not justify deadly force, and "the reasonableness of an officer's asserted fear will often turn on

---

[6]     Downing makes much of minor variations in the officers' descriptions of the events of May 7.  However, the officers' versions of events are not inconsistent.  Further, it is unsurprising the officers recall some details in slightly different ways considering how quickly the events unfolded and the high-stress nature of the situation.

whether an armed suspect pointed [his] weapon at another person." *Mills*, 483 F. Supp. at 460 (citing *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019); *Boyd v. Baeppler*, 215 F.3d 594, 602 (6th Cir. 2000)).  While this disputed fact is one the Court considers, the Court is mindful that an officer does not have to wait until a weapon is raised or pointed at him before using deadly force.  *Thornton v. City of Columbus*, 727 F. App'x 829, 838 (6th Cir. 2018).

The Court must focus on the facts known to Sergeant Petry at the moment he applied deadly force, which are as follows:  Officers responded to the home of suicidal subject who had a loaded gun and was "getting ready to shoot himself."  MCSO was called recently when Downing shot himself in the foot.  In other words, Downing knew how to operate a firearm and would not hesitate to discharge it.  Additionally, the 9-1-1 dispatcher had advised officers that the WellCare nurse had been on the phone with Downing, who had stopped responding, suggesting that Downing knew officers would be responding to his home.

Next, Petry and Chitwood observed Downing walk out onto his deck, holding the rifle with a "blank stare."  The evidence indicates that officers—who were in close proximity to Downing—*repeatedly* announced their presence and instructed Downing to drop his weapon, but he failed to comply.  *See Chappell*, 585 F.3d at 914 (observing that witnesses' failure to *hear* police announce their presence did not create genuine issue of material fact when witnesses may have been distracted by other matters).

It is also undisputed that Petry fired second—only after he heard the first gunshot, which occurred while he had taken cover on the ground.  Since Downing was still holding his weapon when Petry stood up, he reasonably could have assumed that Downing fired the shot and was preparing to fire again.  And while the parties have not provided exact measurements regarding the officers' distance from where Downing was standing, it is clear from the

testimony and the images provided by the parties that it was mere feet.  [*See e.g.,* Record Nos. 54-11, 61-9.]  Further, the entire incident, from the officers' arrival from to the time the first shot was fired, occurred in approximately three minutes. Petry fired the subsequent shots only seconds later.

Downing urges the Court to focus on what he believes was the officers' failure to respond to the situation properly in light of his mental health status.  However, as noted, the Court applies a segmental approach by which the reasonableness of the officer's use of force is evaluated focusing on the moments immediately preceding that use of force, as opposed to "the adequacy of planning or the length of time thinking through the problem at hand." *Rucinski v. Cnty. of Oakland*, 655 F. App'x 338, 342 (6th Cir. 2016) (citing *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007)).  *See also Lemmon v. City of Akron*, 768 F. App'x 410, 417 (6th Cir. 2019) ("[T]he events leading up to the [deadly encounter] are immaterial to the issue of whether [the officer] reasonably utilized deadly force.").  Further, an officer is permitted to use deadly force when he or she has probable cause to believe that a mentally ill person poses an imminent threat of serious physical harm to his person. *Rucinski*, 655 F. App'x at 342.  Accordingly, the officers' purported failure to de-escalate the situation is not relevant to the Court's analysis under binding Sixth Circuit precedent.

In summary, Petry reasonably feared for his life and the lives of his fellow officers in the moments immediately preceding his use of deadly force against Downing.  He is entitled to qualified immunity with respect to Downing's excessive force claim under § 1983.

### D.    Assault and Battery

Kentucky law also provides qualified immunity for public officials except for those who are "plainly incompetent or those who knowingly violate the law." *Rowan Cnty. v. Sloas*,

201 S.W.3d 469, 475 (Ky. 2006).  Qualified immunity attaches to public officers sued in their individual capacities performing discretionary acts in good faith that are within the employee's scope of authority.  *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).  Discretionary acts are "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment."  *Id.*

An officer's decision regarding the amount of force required in a particular situation is a discretionary act.  *See Casey v. Sanders*, 2018 WL 3078758, at *8 (E.D. Ky. June 21, 2018) (collecting cases).  To show that an officer acted in bad faith when making an on-the-spot judgment call, the plaintiff must demonstrate that the officer "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the [plaintiff's] rights or that the officer took the action with the malicious intent to cause a deprivation of constitutional rights or other injury."  *Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. Ct. App. 2007) (quoting *Yanero*, 65 S.W.3d at 523) (internal quotation marks omitted).  Since Petry's actions were objectively reasonable in the § 1983 context, the Court further concludes that Downing could not demonstrate that Petry's use of force was in bad faith.  *See Atwell v. Hart Cnty., Ky.*, 122 F. App'x 215, 219 (6th Cir. Feb. 2, 2005) (concluding that, since defendants' actions were objectively reasonable in § 1983 context, plaintiff could not prove assault and battery under Kentucky law).  Accordingly, qualified immunity applies and this claim will be dismissed.

### E.    Emotional Distress Claims

The Court previously granted Defendant Eaves' motion to dismiss Downing's claims for negligent and intentional infliction of emotional distress because these are gap-filler torts and Downing failed to allege any facts suggesting that Eaves acted with the intent to cause him

emotional harm.  [Record No. 36]  Petry has now moved for summary judgment with respect to these claims against him for the same reasons.

Downing did not respond to this portion of the defendants' motion, so the Court assumes he does not oppose summary judgment in favor of Petry on these claims.  And as previously explained, there is no evidence that any of the defendants solely intended to cause Downing emotional distress.  Further, damages for emotional distress are recoverable under the other claims asserted for assault and battery and § 1983.  [*See* Record No. 54-1, pp. 29-30.]  Accordingly, the Court will grant summary judgment in favor of Petry on Downing's claims for NIED and IIED.

### F.      Official-Capacity Claims Against Petry

The precise nature of Downing's official-capacity claims against Petry is unclear. However, a suit naming an individual in his official capacity is considered a suit against the employer.  *Murphy v. Pike Cnty. Detention Ctr.*, 474 F. Supp. 3d 876, 886 (E.D. Ky. 2020) (citing *Laubis v. Witt*, 597 F. App'x 827, 832 (6th Cir. 2015)).  In response to Petry's motion for summary judgment on these claims, Downing recites the elements for a § 1983 failure-to-train or supervise claim against a municipality under *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978).  Accordingly, the Court assumes that Downing's intent is to pursue a *Monell* claim against MCSO.  However, there can be no liability under *Monell* without an underlying constitutional violation.  *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014). And because Downing has failed to establish that an underlying constitutional violation occurred, these claims will be dismissed.

The claims would fail regardless, because Downing has not identified evidence indicating that he would be able to prove the elements of these claims at trial.  The inadequacy

of police training may form the basis of § 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Wolfanger v. Laurel Cnty., Ky.*, 2008 WL 169804, at *8 (E.D. Ky. Jan 17, 2008) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989)).   Additionally, a county can be held liable under § 1983 only when its policies are the moving force behind the constitutional violation. *Id.*

The plaintiff acknowledges that there are two situations that may constitute deliberate indifference in the failure to train police officers.   The first is when the municipality fails to react to repeated complaints of constitutional violations by its officers. *Id.*   The second occurs when the municipality "fails to provide adequate training in light of foreseeable serious consequences that could result from the lack of instruction." *Id.*   To prove that inadequate training is the moving force behind a constitutional violation, the plaintiff must prove that: (1) the training program was inadequate for the tasks the officers were required to perform; (2) the inadequacy was a result of the city's deliberate indifference; and (3) the inadequacy was "closely related to" or "actually caused the . . . injury." *Id.* (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)).

While the defendants maintain that MCSO officers comply with all state-mandated training, Downing focuses on testimony from the four officers suggesting that they have not had "specialized" training with respect to dealing with mentally ill individuals.  [*See* Record No. 64, p. 23.]  Downing's proposed expert, Roger Clark, stated that Petry "appear[ed] to have failed to follow the basic training materials on handling a person with a mental illness," but made no specific claim that Petry or the other officers were inadequately trained or supervised. [*See* Record No. 57-1, p. 15.]

- 19 -

Further, there is no evidence that the shooting was proximately caused by the alleged failure to train or supervise.  Downing alleges that the defendants should have been trained and/or applied de-escalation techniques such as "mov[ing] slowly" and "assum[ing] a quiet nonthreatening manner when conversing with [him]."  However, he also claims he did not hear officers calling for him to come out and that he did not see the officers until moments before he was shot.  Downing maintains that he opened his garage door and came out holding a rifle on his own volition—not in response to anything the officers said or did.  Accordingly, it is unclear how additional training on de-escalation techniques would have prevented the incident.

## IV.    CONCLUSION

Based on the foregoing analysis, it is hereby

**ORDERED** as follows:

1.    The motion for summary judgment filed by Defendants Brian Eaves and Josh Petry [Record No. 54] is **GRANTED**.

2.    The motion to exclude filed by Defendants Brian Eaves and Josh Petry [Record No. 57] is **GRANTED**.

3.    The plaintiff is directed to **SHOW CAUSE** on or before **Friday, August 27, 2021**, why any claims against remaining Defendants Commonwealth of Kentucky and Unnamed Law Enforcement Officers and Unnamed Supervisors of Individual Defendants should not be dismissed, with prejudice, and why this matter should not be dismissed in its entirety.

- 20 -

Dated: August 13, 2021.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky